UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------

CHRISTOPHER J. SCHILLER, and RESOLUTION
CONSULTING GROUP, INC. (d/b/a RESOLUTION
ENERGY GROUP),

Plaintiffs,

No. 15-CV-4933 (CS)

- against -

DANIEL P. DUTHIE, CONSOLIDATED EDISON
SOLUTIONS, INC., STEPHEN WEMPLE, PATRICK
O'GARA, MUNICIPAL ELECTRIC AND GAS ALLIANCE,
INC., GORDON BOYD, ENERGYNEXT, INC., M&R
ENERGY RESOURCE CORP., MELISSA A. COBUZZI,
CONSTELLATION NEWENERGY, INC., JODY SPAETH,
and JEFFREY S. HILLS,

**OPINION AND ORDER**

Defendants.

-------------------------------------------------------------------------

<u>Appearances</u>:

Richard S. Pakola
New City, New York
*Counsel for Plaintiffs*

Joseph J. Ranni
Ranni Law Firm
Florida, New York
*Counsel for Daniel Duthie*

Scott A. Levinson
Diep Nguyen
New York, New York
*Counsel for Consolidated Edison Solutions, Inc.,*
*Stephen Wemple, and Patrick O'Gara*

Jonathan Wood
Ithaca, New York
*Counsel for Municipal Electric and Gas Alliance, Inc.*

James S. Cox
Snyder, Kiley, Toohey, Corbett & Cox, LLP
Saratoga Springs, New York
*Counsel for EnergyNext, Inc. and Gordon Boyd*

Ralph L. Puglielle, Jr.
Drake Loeb PLLC
New Windsor, New York
*Counsel for M&R Energy Resource Corp.*
*and Melissa A. Cobuzzi*

Erick M. Sandler
Jennifer L. Shukla
Day Pitney LLP
Hartford, Connecticut
*Counsel for Constellation New Energy, Inc.,*
*Jody Spaeth, and Jeffrey S. Hills*

Seibel, J.

Before the Court are the motions to dismiss Plaintiffs' Third Amended Complaint,

("TAC"), (Doc. 154), of Defendant Daniel Duthie, (Doc. 201), Municipal Electric and Gas

Alliance, Inc. ("MEGA"), (Doc. 216), Melissa A. Cobuzzi and M&R Energy Resource Corp.

("M&R"), (Doc. 217), Jeffrey S. Hills, Jody Spaeth, and Constellation New Energy, Inc.

("Constellation"),[1] (Doc. 221), Gordon Boyd and EnergyNext, Inc. ("EnergyNext"), (Doc. 228),

and Patrick O'Gara, Stephen Wemple, and Consolidated Edison Solutions, Inc. ("ConEd"),

(Doc. 231).

---

[1] On June 12, 2017, Constellation NewEnergy, Inc. was substituted as a party for Constellation Energy Services of New York, Inc. (d/b/a/ Integrys Energy). (Doc. 243.) The Clerk of Court is directed to amend the caption accordingly. In 2014 Constellation purchased Integrys Energy Services of New York, Inc. ("Integrys"). (TAC ¶ 60.) The Court will refer to both Integrys and Constellation as Constellation throughout this opinion.

## I. Background

### A. Facts

For purposes of these motions, the Court accepts as true the facts, but not the conclusions, alleged by Plaintiffs in the TAC. The Court distills the lengthy (109 page, 401 paragraph, 14 exhibit) TAC as follows.

The electricity and natural gas markets in New York are broken into areas within which a public utility is responsible for the delivery of energy in the form of electricity and/or natural gas. (TAC ¶ 28.) While the public utility delivers the energy, the consumer may choose to buy electricity or natural gas from either the utility or from an Energy Service Company ("ESCO") that can sell directly to retail consumers, including municipalities. (*Id.* ¶¶ 26-27.) For purposes of this suit, which primarily alleges antitrust violations, Plaintiffs allege that the market is limited to the municipal supply of electricity and natural gas. (*Id.* ¶ 36.) Municipalities purchasing energy must abide by public bidding statutes such as New York General Municipal Law § 103 and other New York laws and regulations. (*Id.*) In the alternative, instead of going through the mandated bidding process, municipalities can "piggyback" off of other municipal contracts that have been publicly bid. (*Id.* ¶ 51.)

Energy consultants assist in matching commercial and municipal clients with the most cost-effective ESCO suppliers who place bids for potential energy supply contracts. (*Id.* ¶¶ 30, 35.) Consultants assist municipalities by formulating specifications and procedures for bids, interfacing with prospective bidders, making recommendations to the municipality as to the lowest qualified bidder, and negotiating a change in rates when needed. (*See id.* ¶¶ 30, 52-53, 57, 81.) There is no allegation that a municipality is obligated to accept a consultant's recommendation or to contract with the lowest bidder. Rather, if it is unhappy with the outcome

3

of a bidding process, it remains free to re-bid, on its own or with the same or another consultant, or to piggyback on another municipality's contract.  (*See id.* ¶¶ 36, 84-87, 106, 109-110.) Consultants enter into agreements with the relevant municipality as well as the ESCOs bidding for the energy contracts, and are paid by the ESCO that is awarded the contract based on a fraction of the energy actually used by the purchasing municipality.  (*Id.* ¶ 35.)

Plaintiffs are Resolution Consulting Group, Inc. (d/b/a Resolution Energy Group) ("REG") and its president Christopher Schiller.  (*Id.* ¶¶ 6-7.)  Plaintiff REG and Defendants MEGA, EnergyNext and Daniel Duthie are energy consultants.  (*Id.* ¶¶ 8, 30.)[2]  MEGA is a not-for-profit corporation that hires EnergyNext (a for-profit entity) and its principal, Defendant Gordon Boyd, as its energy procurement consultant.  (*Id.* ¶¶ 12-13, 50, 56.)  In that role, Boyd reviews the relevant bids and makes recommendations to municipal governments.  (*Id.* ¶ 57.) Defendant M&R is a consultant and an ESCO, (*id.* ¶ 30), and Defendants ConEd, (*see id.* ¶ 199), and Constellation, (*see id.* ¶¶ 56, 60), are ESCOs.

Plaintiffs allege that there is an anti-competitive scheme in place that begins with a county "authorizing MEGA to issue a public [i]nvitation to [b]id ("ITB") or [r]equest for [b]ids ("RFB")," followed by "MEGA and its co-conspirators . . . tak[ing] over all aspects" of the bidding process including:  "(1) drafting the bidding documents, (2) having all questions directed to EnergyNext, rather than the [municipality], (3) EnergyNext answering all questions relating to the bid, rather than referring the questions to the [municipality], (4) requiring all bids to be submitted directly to MEGA . . . rather than the [municipality], and (5) reserving for itself the discretion to decide who ultimately is the lowest responsible bidder."  (*Id.* ¶ 52.)  The TAC does not allege that there is anything illegal about the municipality giving MEGA this authority, or

---

[2] Duthie is also a practicing attorney.  (TAC ¶ 8.)

that MEGA can require the municipality to do so or to accept the bidder MEGA recommends. Plaintiffs allege, however, that MEGA or EnergyNext drafts the bidding requirements in such a way that co-conspirator ESCOs are the only bidders that can meet them. (*Id.* ¶ 53.) In essence, Plaintiffs assert that the bidding processes MEGA and EnergyNext facilitate are "not truly competitive" because the original bids are "'rigged' to ensure that only co-conspirators will win." (*Id.* ¶ 55.) Plaintiffs further allege that the Defendant ESCOs agreed "directly with each other and indirectly through MEGA, not to compete against one another in certain municipal electric and gas bids. In return, each [ESCO] was given the 'exclusive rights' to their assigned energy product and utility territory for all municipal consumers purchasing electric or natural gas through MEGA." (*Id.* ¶ 71.) Thus, municipalities that chose to enter into contracts recommended by MEGA paid supracompetitive prices. (*See, e.g.*, *id.* ¶¶ 84, 130, 136.)

MEGA's bid documents allow any municipality in the relevant utility area to piggyback off of the resulting county energy contracts, which is permitted under New York General Municipal Law § 103, but Plaintiffs allege that

> MEGA's piggy backs are illegal [because]: (1) . . . the original bids are "rigged" to ensure that only co-conspirators win; (2) the subsequent "piggy back" contracts with municipalities are not based upon the original sponsor County contract, as they are required to be [under GML § 103(3),[3]] but rather are different contracts with varying prices, products and terms, drafted in such a way that MEGA and the conspirators benefit, but the municipality overpays; (3) MEGA includes illegal "extension" provisions . . . that allow[] . . . MEGA to invoke two one-year extensions for every contract; [and] (4) energy supply is utility specific, so a County bid in one utility area may not be transferable to another utility . . . .

(*Id.* ¶¶ 53, 55.)

---

[3] New York General Municipal Law § 103 bars municipalities from contracting for "services through the county in which [it] is located or through any county within the state when bids and offers have been received . . . , unless such purchase may be made or the contract for such services may be entered into upon the same terms, conditions and specifications at a lower price through the county." N.Y. Gen. Mun. Law § 103(3).

As a result of the scheme, Plaintiffs allege, since at least 2009 Direct Energy Business Marketing, LLC ("Direct Energy")[4] has won every MEGA-run municipal natural gas bid in the Nat Grid,[5] NYSEG,[6] and RG&E[7] utility territories[8] and every MEGA-run municipal natural gas and electricity bid in the Central Hudson utility territory. (*Id.* ¶¶ 162, 184, 189.) Plaintiffs also allege that, from at least 2003, Constellation has won every MEGA-run municipal electricity bid in the Nat Grid, NYSEG, and RG&E utility territories. (*Id.* ¶¶ 168, 184.) The TAC also asserts that the scheme involved Constellation winning the bids for electricity in the ConEd and O&R[9] utility areas and M&R winning the bids for natural gas in the O&R utility area. (*Id.* ¶ 183.) Plaintiffs allege that the municipalities dealing with MEGA are unaware of the scheme and if they knew about it, they would do business with REG instead, earning Plaintiffs fees from contracts and piggybacks. (*See, e.g.*, *id.* ¶¶ 90, 103, 373(f).)

Plaintiffs allege that the following events evidence the scheme, which is alleged to have originated in 2007 when MEGA, under the auspices of Tompkins County, issued an ITB for

[4] Direct Energy is an ESCO formerly doing business as Hess Energy Marketing, LLC ("Hess"). (TAC ¶¶ 19, 56.) The Court will refer to both Direct Energy and Hess as Direct Energy. Direct Energy is not a named defendant in this suit but is included in a section of the TAC entitled "Non-Parties Who Plaintiffs Intend to Add as Defendants." (*Id.* ¶ 19.)

[5] Plaintiffs mention "Nat-Grid Upstate," (*see, e.g.*, TAC ¶¶ 39, 70), "Nat Grid Upstate," (*see, e.g.*, *id.* ¶¶ 115, 163), "Nat Grid," (*see, e.g.*, *id.* ¶¶ 151, 162), "National Grid," (*see, e.g.*, *id.* ¶¶ 62, 189), "National Grid New York," (*see, e.g.*, *id.* ¶ 88), and "National Grid Upstate," (*see, e.g.*, *id.* ¶ 77). The Court assumes that these varying iterations all refer to the same utility area and will refer to this utility territory as Nat Grid throughout.

[6] "NYSEG" is an acronym for the New York State Electric & Gas Corporation. *See* Avangrid, Inc., Annual Report at 4 (Form 10-K) (Mar. 10, 2017).

[7] "RG&E" is an acronym for the Rochester Gas and Electric Corporation. *See id.*

[8] The TAC refers to this group of utility areas as the "Upstate Energy Market," (TAC ¶ 39), but Plaintiffs did not provide information on how many utility areas there are, what communities they cover, or where precisely they are located. Plaintiffs assert based on minutes from meetings held in 2011 and early 2012 that some unspecified Defendants were selling electricity and natural gas to over 240 municipal energy consumers in the Upstate Energy Market, (*id.* ¶ 72), but because the total number of consumers is not provided it is difficult to put this figure into perspective.

[9] "O&R" is an acronym for the Orange and Rockland Utilities, Inc. *See* Company Information, Orange & Rockland, https://www.oru.com/en/about-us/company-information (last visited Aug. 25, 2017).

municipal electricity supply on behalf of twelve upstate counties and one hundred other municipalities. (*Id.* ¶¶ 69-72.) The bid documents "included many improprieties," in that they included commercial and residential customers, required questions to be submitted to EnergyNext, required bids to be delivered to a MEGA-affiliated entity, and gave MEGA final authority to determine which ESCO submitted the lowest qualified bid. (*Id.* ¶ 69.) The TAC does not explain why these provisions are improper or why a municipality could choose not to proceed with an ITB in such a manner. Nor does it state the results of the 2007 Tompkins County ITB. But it does allege that between the Tompkins County bid in 2007 and 2011, MEGA's portfolio doubled. (*Id.* ¶ 72.) Around 2011, the energy market changed due to market prices dropping for the first time in a decade, consumers being more informed, and greater competition. (*Id.* ¶¶ 80-81.) Around this time some municipalities began seeking alternatives to working with MEGA and allegedly questioned whether MEGA's scheme was "competitive or legal." (*Id.* ¶ 83.)[10]

On September 15, 2011, under the auspices of Genesee County – the legislative chair of which sat on MEGA's board – MEGA issued a public solicitation for municipal electricity and natural gas bids containing similar specifications as those used for the Tompkins County bidding process. (*Id.* ¶¶ 74-75, 77.) Bids were due October 7, 2011, but were not completely reviewed by EnergyNext until October 14, 2011. (*Id.* ¶ 79.) Plaintiffs allege that "[d]uring this seven-day time period, the Antitrust Defendants[11] could have 'adjusted' bids accordingly to determine the lowest responsible bidder in their own personal interest." (*Id.*) At EnergyNext's recommendation, MEGA identified Direct Energy as the lowest responsible bidder for gas and

---

[10] The only example the TAC provides is Dutchess County's announcement that it had saved $129,000 by rejecting MEGA's proposal and would bid out its next energy contract without MEGA. (TAC ¶ 84.)

[11] "Antitrust Defendants" refers to MEGA, EnergyNext, Boyd, M&R, Cobuzzi, Constellation, Spaeth, and Hills.

Constellation as the lowest responsible bidder for electricity, and Genesee County accepted those recommendations. (*Id.* ¶¶ 77-78.) Direct Energy allegedly submitted electricity bids that were "complimentary" or "courtesy" bids that were almost double Constellation's and the highest bid in nearly every pricing category. (*Id.* ¶ 186.) Constellation did not bid on natural gas. (*Id.*)

On September 27, 2011, the Town of Ramapo (the "Town") hired REG as an energy consultant. (*Id.* ¶ 194.2.)[12] On October 4, 2011, the Town and REG entered into a Consulting Services Agreement (the "REG CSA") under which REG would be the Town's exclusive energy consultant of record. (*Id.* ¶¶ 195.2-96; *id.* Ex. F.)[13] The REG CSA provided that, "unless terminated earlier as provided in th[e a]greement," it would be in force "for the duration of the initial energy supply term contracted through R[E]G," (*id.* ¶ Ex. F at 2), (which turned out to be two years), (*id.* ¶ 197)), and that "[e]ither party [could] terminate th[e a]greement, with or without cause, upon three days prior written notice," (*id.* Ex. F at 2). On October 28, 2011, with Plaintiffs' assistance, the Town entered into two-year fixed-rate contracts with Direct Energy for electricity and with Gateway Energy Services ("Gateway") for natural gas. (*Id.* ¶ 197.) At the end of two years, these contracts would convert to at-will contracts with variable rates. (*Id.* ¶ 197; *see id.* ¶ 238.) Soon after Schiller was retained, Town Purchasing Director Mona Montal asked him whether he could help the Town in getting municipal rates for various residences. (*Id.* ¶¶ 21, 198.) Montal was allegedly "displeased" with Schiller's "lack of cooperation." (*Id.* ¶ 198.)

---

[12] The TAC has two paragraphs numbered 194. (*See* TAC at 59-60.) I will refer to the first paragraph 194 as 194.1 and the second paragraph 194 as 194.2.

[13] The TAC has two paragraphs numbered 195 and 196. (*See* TAC at 59-60.) I will refer to the first paragraph 195 and 196 as 195.1 and 196.1 and the second paragraphs as 195.2 and 196.2.

Also around 2011, the Town hired Defendant Duthie to assist in a matter unrelated to Plaintiffs' work for the Town. (*Id.* ¶ 199.) Duthie allegedly advised various Town personnel that Schiller's services were inadequate, that the electricity supply rates for the Town's streetlights were "very high," and that he had friends at ConEd who could offer better rates, including municipal rates to private individuals within the Town. (*Id.*)

In November 2011, MEGA and Constellation entered into a written agreement whereby, among other things, MEGA would recommend Constellation to MEGA electricity participants in the Nat Grid, NYSEG and RG&E utility areas and Constellation would pay MEGA a royalty based on energy sold; Constellation agreed to allow participants to convert to a fixed price even if they had previously elected variable pricing; and both parties agreed to develop a marketing plan. (*Id.* ¶ 62; *id.* Ex. B.)

In July 2012, Rockland County decided to stop using MEGA as its consultant and instead sought bids for electricity through Plaintiffs, resulting in more supplier bids than MEGA typically received and better pricing than MEGA's renewal quote. (*See id.* ¶ 86.) Through Plaintiffs, Rockland County awarded a twenty-four month contract to Direct Energy. (*Id.*) Various former clients of MEGA complained to Schiller about the lack of competition in MEGA bids. (*Id.* ¶ 88.) In October 2012, Putnam County conducted an electricity bid through Plaintiffs and awarded the contracts to GDF Suez. (*Id.* ¶ 87.) Putnam County's electricity award allowed for other subdivisions in the NYSEG utility area to piggyback off of Putnam County's contract, but many municipalities that worked with MEGA were locked into long term agreements with Constellation or Direct Energy. (*Id.* ¶ 89.) Plaintiffs allege that had this not been the case, these municipalities would have piggybacked on REG's Putnam County contract. (*Id.* ¶ 90.) This allegation appears to rest on the assumption that because these municipalities had chosen to

piggyback with MEGA, their only other choice would have been to piggyback with REG, rather than to work with a different consultant or on their own to solicit bids. (*See id.*)

On October 10, 2012, the Town retained Duthie to procure electric supply for streetlights for a period of 120 days. (*Id.* ¶ 200.) On October 25, 2012, Duthie called Schiller and falsely claimed to be an attorney from the Ramapo Town Attorney's Office. (*Id.* ¶ 203.) Duthie allegedly did this to obtain confidential information to use to fabricate a justification for the Town to terminate REG and allow Duthie to take over REG's contract with the Town. (*Id.*) Plaintiffs do not allege that they provided any such information. On October 26, 2012, Schiller called Town Attorney Michael Klein to complain about Duthie's phone call and was told that although Klein would tell Duthie to stop working on streetlight electricity procurement, Duthie had a close relationship with members of the Town Board and it was in Schiller's best interest to assist Duthie. (*Id.* ¶¶ 206-07.)

In mid-November 2012, Duthie again attempted to obtain confidential and proprietary information from Schiller. (*Id.* ¶¶ 208-09.) Duthie falsely told Schiller that the Town Board was investigating Schiller for not complying with procurement procedures and that Duthie had been asked to review all of the energy contracts, (*id.* ¶ 209), but Plaintiffs allege that the Town Board had not authorized any such investigation, (*id.* ¶ 217). On November 30, 2012, Beth Finkelstein, an Assistant Town Attorney, sent Schiller a letter (on Town letterhead but allegedly drafted by Duthie) informing Schiller that she had been asked by the Town Attorney "to investigate the circumstances surrounding the bidding and contract awards of all the Town's electricity and gas accounts to Direct [Energy] and Gateway." (*Id.* ¶¶ 21, 210.) Schiller spoke with Finkelstein and understood several of her comments to be threats to, among other things, slander him to the Town Board and his other municipal clients if he spoke at a Town Board meeting. (*See, e.g.*, *id.*

¶¶ 212-15.)  Schiller accordingly did not attend a Town Board meeting for approximately a year. (*Id.* ¶ 216.)

On December 12, 2012, Genesee County authorized MEGA to issue an ITB for natural gas, electricity and renewable energy credits.  (*Id.* ¶¶ 92, 94.)  It authorized the inclusion of all political subdivisions in the state.  (*Id.* ¶ 92.)  As in the previous MEGA bids, MEGA controlled all aspects of the bidding process and ultimately decided who was awarded the contracts.  (*Id.* ¶ 93.)  MEGA sought, among other things, bids for electric supply in the Central Hudson utility area, even though that area is nowhere near Genesee County.  (*Id.* ¶ 95.)  Genesee County awarded the electricity and natural gas contracts to Direct Energy.  (*Id.* ¶ 96.)

On January 23, 2013, Schiller called Klein to complain about Duthie and the Town's actions.  (*Id.* ¶ 218.)  Klein told Schiller not to make any complaints or file a grievance as doing so "would only make matters worse," which Schiller interpreted as a threat.  (*Id.* ¶ 220.)

In early February 2013, the City of Poughkeepsie ("Poughkeepsie"), which had previously worked with MEGA, engaged Plaintiffs to assist in the bidding of its electricity and natural gas awards.  (*Id.* ¶ 97.)  Poughkeepsie awarded a thirty-six month electricity contract to Liberty Power and a thirty-six month natural gas contract to Hudson Energy Services.  (*Id.* ¶ 100.)  Poughkeepsie's electricity and natural gas awards allowed for all political subdivisions in the Central Hudson utility area to piggyback off of the contract secured through Plaintiffs, but many were already enrolled in or were in the process of piggybacking off of the Genesee County agreements with Direct Energy from the recent December 2012 bid.  (*Id.* ¶ 102.)  Plaintiffs again assert that MEGA's piggybacks were illegal and that if they had somehow been invalidated, all municipalities that had chosen to piggyback with MEGA would necessarily have piggybacked on

Plaintiffs' Poughkeepsie contract. (*See id.* ¶¶ 55, 103.) Plaintiffs do not explain what stopped the municipalities that were in process with MEGA from switching to REG.

By late 2013, Rockland County, Putnam County and Poughkeepsie had all, within a period of eight months, stopped working with MEGA and engaged Plaintiffs instead. (*See id.* ¶ 105.) Plaintiffs allege that the Antitrust Defendants began to "target[]" them, "agreeing to take certain actions in order to protect [the Antitrust Defendants'] turf and . . . push Plaintiffs out of the relevant markets." (*Id.* ¶ 106) (internal quotation marks omitted).

On March 11, 2013, Schiller made a $500 political contribution to Town Councilman Daniel Friedman, a sitting member of the Town Board who was speaking out about corruption in the Town. (*Id.* ¶ 223.) Plaintiffs allege that the Former Town Defendants[14] and Duthie were aware of Schiller's contribution to Friedman and had a motive to silence Schiller and Friedman and to retaliate against Schiller. (*Id.*)

Because he had been informed by Town officials that he was still the Town's energy consultant, in September 2013, Schiller worked to obtain new energy contracts for the Town. (*Id.* ¶ 225.) Unbeknownst to Schiller, Duthie met with Defendant Patrick O'Gara, a ConEd employee until approximately March 2014, and Defendant Stephen Wemple, the Vice President of Regulatory Affairs for ConEd. (*Id.* ¶¶ 10, 11, 225.) Duthie sent out a Request for Qualifications ("RFQ") relating to energy supply which had not been authorized by the Town Board, and conferred with ConEd both before and after. (*Id.* ¶¶ 225-26.)

In late October 2013, Klein and Michael Reilly, the Town Coordinator of Intergovernmental Relations, falsely informed Schiller that the Town Board had terminated

---

[14] "Former Town Defendants" refers to the Town; the Town Board; Town Supervisor Christopher St. Lawrence; Town Councilpersons Brendel Charles, Yitzchok Ullman and Patrick Withers; and Town officials Mona Montal, Michael L. Klein, Beth Finkelstein, Michael Reilly and Nathan Oberman. (Doc. 100.)

REG's contract and authorized Duthie to proceed with executing the bidding process for the rates that were set to expire. (*Id.* ¶¶ 21, 227.) On October 25, 2013, Schiller spoke with Montal, who told him to proceed with procuring the renewal energy contracts and that she would address Duthie's unauthorized RFQ with Klein. (*Id.* ¶¶ 228-29.) That same day Schiller emailed O'Gara to notify him about the upcoming Town bid and invite ConEd to participate. (*Id.* ¶ 285.)

On November 13, 2013, Schiller attended a Town Board meeting. (*Id.* ¶ 233.) Plaintiffs allege that the Town Board asked Schiller not to speak publicly but rather only in the executive session, and that Reilly accused Schiller of threatening to call the Federal Bureau of Investigation ("FBI") on him. (*Id.* ¶¶ 233-34.) Plaintiffs allege that Klein said in the executive session that he had a proposal from ConEd that contained hidden and undisclosed fees for Schiller. (*Id.* ¶ 235.) The proposal was the email that Schiller had sent O'Gara at ConEd on October 25, 2013, which O'Gara had forwarded to Duthie and Duthie had then given to Klein. (*Id.* ¶¶ 235, 285.) Schiller complained to the Town Board that Duthie had issued an RFQ without authorization from the Town Board, that Duthie was trying to take over Plaintiffs' contract, and that ConEd should not have been speaking with Duthie or Town personnel before the bid. (*Id.* ¶¶ 234, 236.) On or about December 1, 2013, the Town's fixed energy rates (obtained in 2011 through Plaintiff REG) lapsed. (*Id.* ¶¶ 197, 238.) The contracts continued on a month to month basis, which triggered variable rates and substantial increases in cost. (*Id.* ¶ 238.) The Town wanted to renew the previous rates but wanted Duthie to handle the matter instead of Plaintiffs. (*Id.* ¶ 239.)

On February 10, 2014, Schiller publicly stated at a Town Board meeting that the Town was paying extremely high rates because of the lapsed contract, and was told that the Town would not use REG or Duthie to negotiate new energy contracts. (*Id.* ¶¶ 242-43.) When Town

Supervisor Christopher St. Lawrence said that he would be handling the rebidding of the contracts himself, Schiller responded that he would be hiring an attorney to sue the Town and that he had reported the Town's earlier actions to the FBI.  (*Id.* ¶¶ 21, 243.)

On February 20, 2014, Schiller again publicly addressed the Town Board about Klein's and Finkelstein's dishonesty, cronyism in the Town, and the impact the lapsed energy rates were having on taxpayers.  (*Id.* ¶ 244.)  On March 10, 2014, at a Town Board workshop, Councilman Friedman echoed these concerns.  (*Id.* ¶ 245.)  On March 13, 2014, an article entitled "Wasting Energy" appeared in the *Rockland County Times* detailing Schiller's interactions with the Town Board and the Town Attorney's Office.  (*Id.* ¶ 246.)  That day, Montal informed Schiller that St. Lawrence directed her to exclude Schiller from the process of renewing the energy rates because St. Lawrence was furious at Schiller for bringing the lapsed rates to the public's attention, providing documentation to Friedman to use in his March 10, 2014 speech, cooperating with the FBI, and giving negative comments to the *Rockland County Times*.  (*Id.* ¶ 249.)  According to Plaintiffs, around this time Duthie "ceased to play an active part in the conspiracy" and the Town began looking for other options to replace Plaintiffs.  (*Id.* ¶ 247.)

On March 13, 2014, Rockland County, while reserving its right to issue its own solicitation, issued a request for bids through MEGA for electricity and natural gas that followed all appropriate bidding requirements.  (*Id.* ¶¶ 109-10.)  Also in March 2014, Town officials began to contact MEGA, EnergyNext and their ESCOs regarding re-bidding the Town's energy contracts.  (*See id.* ¶¶ 248, 314.)  Plaintiffs allege that "Montal informed MEGA, EnergyNext, [Constellation] and M&R that one of the reason[s] for piggybacking off of MEGA's County contract [– rather than, presumably, piggybacking off of Rockland County's contract procured by

REG –] was to deprive Schiller [of] his fees." (*Id.* ¶ 315.) Schiller himself told M&R and Constellation that the Town was attempting to retaliate against him. (*Id.*)

On March 20, 2014, the Town passed a resolution to procure energy through MEGA. (*Id.* ¶ 250.) On March 21, 2014, while the MEGA bid was still open, Rockland County issued a request for an energy consultant to assist in issuing independent energy bids. (*Id.* ¶ 111.) MEGA and EnergyNext had already lost consulting business for Rockland County's electricity supply to Plaintiffs in 2012, and in June 2014, Plaintiffs were chosen as the consultant to manage Rockland County's bid for electricity and natural gas. (*See id.* ¶ 123.)

On April 3, 2014, Rockland County hosted the opening for electricity and natural gas bids it had received through MEGA. (*Id.* ¶ 118.) There were two qualified electricity bids and four qualified natural gas bids. (*Id.*) According to Plaintiffs, Direct Energy did not submit a bid for electricity, despite being the provider of electricity for Rockland County at the time. (*Id.* ¶ 188.) Through MEGA, Rockland County awarded a thirty month electricity contract to Constellation[15] and a thirty-two month gas contract to M&R. (*Id.* ¶ 119.) Plaintiffs infer from this outcome that prior to the bid, a deal was made amongst MEGA, EnergyNext, Constellation, Direct Energy, and M&R that the natural gas market in the O&R utility area would be allocated to M&R. (*Id.* ¶ 121.)

On August 22, 2014, through Plaintiffs, Rockland County issued a request for bids for electricity and natural gas supply. (*Id.* ¶ 124.) ESCOs wishing to bid needed REG's consultant fee and the list of municipal utility accounts, both of which were not publicly available but could be obtained through REG. (*Id.* ¶ 126.) Plaintiffs sent M&R this information. (*Id.* ¶ 129.)

---

[15] Plaintiffs allege that in this and previous bids through MEGA, Constellation routinely submitted atypical pricing terms – for example, bids for time frames longer or shorter than those set forth in the specifications – in addition to the actual terms requested. (*Id.* ¶ 120.)

On September 9, 2014, Defendant Melissa A. Cobuzzi, the CEO-President of M&R, (*id.* ¶ 15), provided MEGA and EnergyNext with a letter offering MEGA clients in the O&R utility area a "special price" for twelve months, (*id.* ¶¶ 137-38; *see id.* Ex. C). The price was lower than M&R's bid through MEGA by the exact amount of REG's commission, thus providing MEGA twelve months at the same price M&R had bid through REG. (*Id.* ¶ 138.)

On September 10, 2014, Rockland County hosted the opening for electricity and natural gas bids it had received through REG. (*Id.* ¶ 130.) While neither MEGA nor EnergyNext was involved in the process, Barbara Blanchard of MEGA as well as Boyd from EnergyNext were in attendance. (*Id.* ¶ 131.) Several people including Schiller, Rockland County employees and representatives from participating ESCOs witnessed Boyd of EnergyNext and Cobuzzi of M&R passing notes back and forth while the bid opening was in progress. (*Id.*) Boyd was also seen shuffling and writing on papers he had in an open folder. (*Id.*) Once the bidding was closed and Boyd had heard all of the other bids, he slid an envelope across the table to a Rockland County representative, stating that it contained an electricity bid from Constellation through MEGA. (*Id.* ¶ 132.) Plaintiffs allege that Cobuzzi had provided Constellation with the utility account list and REG's consultant fee necessary to develop this bid. (*Id.*) Plaintiffs allege that this bid constituted "predatory pricing," as Constellation bid "below market value, or with certain parties . . . taking losses, knowing . . . they could recoup their losses through 'piggy back' rights" in contracts that would follow. (*Id.* ¶ 134; *see id.* ¶ 135.) M&R only submitted a natural gas bid even though it is licensed to supply both electricity and natural gas. (*Id.* ¶ 129.) M&R's bids through REG for natural gas based on twelve month and twenty-four month terms were lower than those submitted through MEGA in April 2014. (*Id.* ¶¶ 119, 136.) Direct Energy submitted an electricity bid that was also significantly lower than its earlier bid through MEGA. (*Id.*

¶ 130.)  Immediately after the close of the bid, Schiller and various ESCO representatives saw Blanchard, Boyd and Cobuzzi exit together and have a private discussion outside of the bid room.  (*Id.* ¶ 139.)  Cobuzzi then reentered the room and handed the Rockland County representative a marked-up version of the letter she had provided on behalf of M&R to EnergyNext and MEGA the day before the bid.  (*Id.*)  Cobuzzi had crossed out and lowered the twenty-four month rate offered.  (*See id.* Ex. C.)

In total, Rockland County received ten qualified electricity bids and seven qualified natural gas bids – more than in the MEGA solicitation.  (*Id.* ¶ 130.)  Rockland County disqualified the Constellation and M&R bids that were submitted on behalf of MEGA, but not the bid M&R provided to REG, and Plaintiffs recommended that Rockland County award a twenty-four month contract to M&R for natural gas, as it was in Rockland County's best interest.  (*Id.* ¶¶ 136, 143.)  Rockland County also awarded a thirty-six month electricity contract to Liberty Power after Plaintiffs negotiated to obtain a cost lower than Constellation's disqualified bid.  (*Id.* ¶¶ 146, 257.)

Upon later inquiry by Rockland County and Schiller, Defendant Jeffrey S. Hills, a Senior Account Executive at Constellation, (*id.* ¶ 18), said that at MEGA's request, Constellation was a "MEGA supplier and would only bid through MEGA," and Defendant Jody Spaeth, Vice President of Sales and Marketing for Constellation, (*id.* ¶ 17), said that Constellation "likes the way things are," adding that compliance with public bidding laws was the responsibility of the municipal customer, not of Constellation, (*id.* ¶¶ 144-45).

On September 18, 2014, Town Purchasing Director Montal emailed Cobuzzi of M&R asking her to be in touch about a contract for twelve to twenty-four months beginning October 8, 2014.  (*Id.* ¶ 258.)  Montal noted that the Town was "looking for a price that w[ould] beat

MEGA and the County pricing" and that would be independent of both the Rockland County and MEGA bids. (*Id.* ¶¶ 258-59.) By email Cobuzzi told Montal that M&R would only be bidding on natural gas and that if the Town needed an electricity quote it should reach out to Constellation. (*Id.* ¶ 260.)

On October 6, 2014, the Town Board decided to conduct "a fair, impartial competitive process" for selecting energy suppliers at a special meeting to be held on October 8, 2014. (*Id.* ¶ 261.) On that same day Schiller communicated to Cobuzzi of M&R and Spaeth of Constellation that the Town intended "to retaliate against him, by circumventing REG and the County's award." (*Id.* ¶ 262.) Plaintiffs allege that "[b]ased upon these communications, as well as the publicity relating to Ramapo's energy contracts, MEGA, [Constellation], EnergyNext and M&R were all aware of the Town's [alleged intention to] retaliat[e] against Plaintiffs, as well as the illegality of the bid that was about to take place." (*Id.*) On October 7, 2014, Cobuzzi told Montal to request pricing through MEGA and assured Montal that M&R (through MEGA) would match the price it had offered Rockland County through REG. (*Id.* ¶ 263.) M&R's markup for the MEGA/County bid had been higher than for M&R's REG/County bid, but M&R reduced the former so that the Town would pay the same whether it piggybacked off of the MEGA or REG contracts. (*Id.* ¶ 267.) On October 8, 2014, the Town Board adopted a resolution that provided that the "bid prices obtained by the County of Rockland [via REG] were higher than the prices obtained through MEGA," and thus the Town would use M&R for natural gas and Constellation for electric through MEGA piggyback contracts. (*Id.* ¶¶ 272-74.) Plaintiffs allege that the Town Board was incorrectly informed that the bid prices obtained by the County through REG were higher than those obtained through MEGA. (*Id.* ¶ 269.) The Town's

decision not to piggyback off of REG's Rockland County contracts caused Schiller to suffer financial loss in the form of lost fees.  (*Id.* ¶ 275.)

On February 12, 2015, Genesee County issued invitations to bid through MEGA for electricity and natural gas supply in the Upstate Energy Market and ConEd utility areas.  (*Id.* ¶¶ 148, 163.)  The specifications required that qualified bidders have a sales force in upstate New York, thus eliminating many gas ESCOs in ConEd's utility territory with which Plaintiffs could have partnered on a bid.  (*Id.* ¶¶ 166-67.)  Plaintiffs allege that based on the requirements set by MEGA and EnergyNext, Direct Energy was the only ESCO capable of winning the bid for gas in the ConEd territory.  (*Id.* ¶¶ 159, 162.)  Despite being licensed to sell natural gas in these utility areas, Constellation bid only on electricity.  (*Id.* ¶ 193.)

In a fall 2015 Putnam County electricity bid within the NYSEG utility area, which is not otherwise described, Direct Energy and Constellation did not participate despite Plaintiffs' efforts to get them to do so.  (*Id.* ¶¶ 180, 194.1.)  In a 2016 Poughkeepsie bid within the Central Hudson utility area run by REG, Constellation and M&R did not participate.  (*Id.* ¶ 195.1.) Direct Energy participated but was not awarded the contracts.  (*Id.*)

In short, Plaintiffs allege that Defendants MEGA and EnergyNext conspired with the Defendant ESCOs to allocate markets in order to give the Defendant ESCOs an unfair advantage and to increase prices for enrolled municipalities and therefore increase the commissions they earned.  (*See id.* ¶ 44.)  For this scheme to work, the municipalities that do business with MEGA would have to be willing to:  1) pay more for their energy than they would pay to non-conspirator ESCOs bidding through a consultant other than MEGA; and 2) break or countenance the breaking of public bidding laws and/or the regulations regarding piggybacking.  They do this, the TAC posits, out of ignorance or cronyism (or, in the case of the Town of Ramapo,

vindictiveness). (*See id.* ¶¶ 75, 82, 91, 249, 373(c).)[16] The TAC further posits that if these municipalities decided not to do business through MEGA and its coconspirators, they would have done business with Plaintiffs instead (as opposed to seeking bids on their own or through another consultant, or piggybacking on the contracts of a different entity, if available). (*See, e.g.*, *id.* ¶¶ 90, 103, 373(f).) Accordingly, Plaintiffs allege, they have been deprived of commissions they would have earned on those municipalities' purchases of electricity and natural gas. (*See id.* ¶¶ 263, 315, 338, 373(g).)

## B.   <u>Procedural History</u>

In May 2014, Schiller filed a notice of claim against the Town. (*Id.* ¶ 253.) On June 24, 2015, Plaintiffs filed the original complaint alleging state and federal law claims.[17] (Doc. 4.) On July 27, 2015, the Court granted a request by Defendants (with the exception of Duthie) for a pre-motion conference concerning a proposed motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Docs. 12, 13.) On August 14, 2015, the Court granted a request by Plaintiffs to amend the complaint on or before September 10, 2015, and adjourned the pre-

---

[16] The TAC does not allege that MEGA used bribery, threats or other criminal means to induce municipalities to do business through MEGA. The closest it comes is an allegation that "there is . . . reason to believe that MEGA's 2014 [Town of] Ramapo piggy back benefited private residences of Town employees." (TAC ¶ 65.) The "reason to believe" is apparently that Montal asked Schiller whether he could obtain municipal rates for "various residences within the Town," (*id.* ¶ 198), that Duthie told the Town that ConEd would provide municipal rates to private individuals, (*id.* ¶ 199), and that in May 2014 Cobuzzi told Montal, when Montal said that an earlier energy supplier had provided an "extension" for Town employees, that they could "briefly discuss a residential program," (*id.* ¶ 254). Given that ConEd never supplied the Town, through MEGA or otherwise, and that the alleged conversation involving Duthie did not refer to the residences of Town employees, let alone Town employees involved in the bidding process, that conversation does not plausibly suggest that municipal rates were provided to Town employees to corrupt the process. Further, although Cobuzzi's company, M&R, did supply the Town via the 2014 piggyback, there is no suggestion that Montal's inquiry regarding Town employees went anywhere, nor are there any facts rendering it plausible that her request was for a bribe in connection with the gas bids, as opposed to an innocent effort to see if a benefit for all Town employees was possible.

[17] Plaintiffs brought suit for: 1) First Amendment retaliation under 42 U.S.C. § 1983; 2) violation of the Fourteenth Amendment Due Process Clause under § 1983; 3) *Monell* liability under § 1983; 4) conspiracy under § 1983; 5) breach of contract; 6) tortious interference with business and contractual relationships; 7) injury to business reputation; 8) injurious falsehood; 9) *prima facie* tort; 10) commercial disparagement and defamation; and 11) tortious interference with prospective business relations and economic advantage. (Doc. 4.)

motion conference. (Docs. 20, 21.) On September 10, 2015, Plaintiffs filed an Amended

Complaint ("AC"), (Doc. 22), adding new defendants, including the Town of Ramapo Town

Board, and asserting additional federal claims.[18] On September 11, 2015, without leave of the

Court, Plaintiffs filed a "corrected" amended complaint. (Doc. 24; *see* Doc. 23.) On October 5,

2015, the Court granted a request by Defendants (with the exception of Duthie) for a pre-motion

conference to discuss a potential motion to dismiss the AC under Federal Rules of Civil

Procedure 8 and 12(b)(6). (Doc. 31.) On November 4, 2015, the Court held such a conference

and urged Plaintiffs to streamline their complaint. Despite the Court's suggestion, on December

18, 2015, Plaintiffs filed a lengthy Second Amended Complaint ("SAC"), (Doc. 51), that added

new claims and several new defendants.[19]

On February 9, 2016, the Town (on behalf of itself and several individual Town

officials), made an offer pursuant to Federal Rule of Civil Procedure 68, (Doc. 100 Ex. A),

which was accepted on February 22, 2016, (Doc. 100). On March 10, 2016, the Court entered

partial judgment in favor of Plaintiffs against the Former Town Defendants. (Doc. 119.)

On March 29, 2016, a pre-motion conference was held to discuss Defendants' potential

motions to dismiss. On June 14, 2016, Plaintiffs filed the TAC.[20] On September 23, 2016,

---

[18] In the AC Plaintiffs brought suit for: 1) violation of the Fourteenth Amendment Due Process Clause (liberty interest) under § 1983; 2) violation of the Fourteenth Amendment Due Process Clause (property interest) under § 1983; 3) First Amendment retaliation under § 1983; 4) civil RICO under 18 U.S.C. § 1962(c); 5) civil RICO conspiracy under 18 U.S.C. § 1962(d); 6) *Monell* liability under § 1983; 7) conspiracy under § 1983; 8) breach of contract; 9) tortious interference with business and contractual relationships; 10) injury to business reputation; 11) injurious falsehood; 12) commercial disparagement and defamation; 13) tortious interference with prospective business relations and economic advantage; and 14) deceptive practices under New York General Business Law § 349. (Doc. 22.)

[19] The SAC alleged the same claims as the AC as well as a claim for First Amendment Retaliation under § 1983 and a claim for violation of § 1 of the Sherman Act and §§ 4 and 16 of the Clayton Act. (Doc. 51.)

[20] The TAC asserts claims for 1) conspiracy under § 1983; 2) civil RICO under 18 U.S.C. § 1962(c); 3) tortious interference with business and contractual relationships; 4) deceptive practices under N.Y. Gen. Bus. Law § 349; 5) § 1 Sherman Act – unreasonable restraint of trade; 6) § 2 Sherman Act – Monopolization; 7) § 2 Sherman Act – Attempted Monopolization; 8) § 2 Sherman Act – Conspiracy to Monopolize; and 9) violation of the New York Donnelly Act. (Doc. 154 ¶¶ 300-401.) The claims under § 2 of the Sherman Act for monopolization, attempted

another pre-motion conference was held at which Defendants' potential motions to dismiss the TAC were discussed.  In order to assist it in understanding the lengthy and turgid TAC, the Court ordered Plaintiffs to submit, for each of the nine claims, a one page summary stating what they were alleging, against whom, and the facts on which the claim relied.  On October 17, 2016, Plaintiffs submitted an eleven-page letter that did not discuss each claim in a page or summarize the relevant facts, but rather set forth the elements of each claim and argued (sometimes with case law) that Plaintiffs had plausibly alleged them.  (Doc. 189.)  On December 14, 2016, Defendant Duthie moved to dismiss the TAC, (Doc. 201), and on May 24, 2017, Defendants MEGA, (Doc. 216), Cobuzzi and M&R, (Doc. 217), Hills, Spaeth and Constellation, (Doc. 221), Boyd and EnergyNext, (Doc. 228), and O'Gara, Wemple and ConEd, (Doc. 231), did the same.

## II.  **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alterations, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure

_____

monopolization, and conspiracy to monopolize were new to the TAC.  Plaintiffs have withdrawn the § 1962(c) civil RICO conspiracy claim (Count Two).  (*See* Doc. 189.)

from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   Discussion

### A.      Federal Rule of Civil Procedure 8

Federal Rule of Civil Procedure 8(a)(2) "requires a complaint to include a short and plain statement of the claim showing that the pleader is entitled to relief.  If a complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised, it should be dismissed." *Cohen v. Capers*, No. 16-CV-6090, 2017 WL 2455132, at *3 (S.D.N.Y. June 6, 2017) (internal quotation marks omitted), *appeal docketed*, No. 17-2285 (2d Cir. July 26, 2017).  "When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, or to dismiss the complaint." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted) ("We do not mean to imply that the court has no power to dismiss a prolix complaint without leave to amend in extraordinary

circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible . . . .").

ConEd, O'Gara, Wemple, Duthie, the ESCO Defendants,[21] MEGA, EnergyNext, and Boyd argue that the TAC should be dismissed because it fails to conform with the pleading requirements outlined in Rule 8(a)(2). (ConEd's Mem. at 1, 4; Duthie's Mem. at 4; ESCOs' Mem. at 3 n.3; MEGA's Mem. at 5; EnergyNext's Mem. at 3.)[22]  This Court has noted on previous occasions that Plaintiffs' complaints have been unnecessarily long and convoluted.  The TAC is 401 paragraphs and 109 pages long, with thirty-eight pages of exhibits (including summary charts).  It takes literally hours to read and understand.  It could have been much more clear and concise.  But given the number of Defendants, the complex nature of the claims, and the length of the relevant time period, I do not find it appropriate to dismiss under Rule 8(a)(2). *See Doran v. N.Y. State Dep't of Health Office of Medicaid Inspector Gen.*, No. 15-CV-7217, 2017 WL 836027, at *8 (S.D.N.Y. Mar. 2, 2017) ("The SAC is 412 paragraphs in length and spans 68 pages.  It leaves much to be desired in terms of brevity, consistency, clarity, and specificity.  However, given the number of plaintiffs and defendants and the span of events, the Court cannot conclude the SAC is unnecessarily prolix in violation of Rule 8(a)(2).").  Plaintiffs do themselves a disservice, however, to the extent that the TAC's diffuse and prolix allegations make it difficult to discern the plausibility of their claims.

---

[21] "ESCO Defendants" refers to M&R, Cobuzzi, Constellation, Spaeth and Hills.

[22] "ConEd's Mem." refers to ConEd's, O'Gara's and Wemple's Memorandum of Law in Support of their Motion to Dismiss, (Doc. 232); "Duthie's Mem." refers to Daniel Duthie's Memorandum of Law in Support of his Motion to Dismiss, (Doc. 202); "ESCOs' Mem." refers to M&R's, Cobuzzi's, Constellation's, Spaeth's, and Hills's Memorandum of Law in Support of their Motions to Dismiss, (Doc. 223); "MEGA's Mem." refers to MEGA's Memorandum of Law in Support of its Motion to Dismiss, (Doc. 216 Ex. 1); and "EnergyNext's Mem." refers to EnergyNext's and Boyd's Memorandum of Law in Support of their Motion to Dismiss, (Doc. 228).

**B.**     **Sherman Act Violations:  Antitrust Standing/Antitrust Injury**

Plaintiffs advance four claims under the Sherman Act against the Antitrust Defendants. (*See* TAC ¶¶ 366-396.)  "To survive a motion to dismiss, a Sherman Act claim must (1) define the relevant geographic market, (2) allege an antitrust injury, and (3) allege conduct in violation of antitrust laws."  *Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (internal quotation marks omitted).

"An antitrust plaintiff must show both constitutional standing and antitrust standing at the pleading stage."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016); *see also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) ("Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law.")  (alteration and internal quotation marks omitted).  "The limitation of antitrust standing to a proper party arose because antitrust law has long recognized that defendants who may have violated a provision of the antitrust statutes are not liable to every person who can persuade a jury that he suffered a loss in some manner that might conceivably be traced to the conduct of the defendants."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 157 (alteration and internal quotation marks omitted).  Were the law otherwise, "the potent private enforcement tool that is an action for treble damages could be invoked without service to – and potentially in disservice of – the purpose of the antitrust laws," *Gatt*, 711 F.3d at 75, which is "the protection of competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).  "A court must answer three separate questions to determine if plaintiffs have antitrust standing:  have plaintiffs alleged injury in fact; have they alleged antitrust injury[;] and are they efficient enforcers of the antitrust laws?"  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 357 (S.D.N.Y. 2016).

The Antitrust Defendants argue that Plaintiffs lack antitrust standing to pursue any claim under either §1 or § 2 of the Sherman Act because they have not alleged an antitrust injury. (ESCOs' Mem. at 19-21; MEGA's Mem. at 14; EnergyNext's Mem. at 8-10.) "[T]o establish antitrust injury, [a] plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." *Gatt*, 711 F.3d at 76 (alteration and internal quotation marks omitted). This analysis requires comparison of "the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Id.* (internal quotation marks omitted). "It is not enough for the actual injury to be causally linked to the asserted violation." *Id.* (internal quotation marks omitted).

Here the alleged anticompetitive effect of the practices alleged to have violated the antitrust laws is that they reduced competition among ESCOs bidding through MEGA, resulting in higher prices to the municipal consumers that bought energy through contracts resulting from MEGA-run bidding. The injury Plaintiffs allege is that they lost commissions they would have earned had those consumers chosen to do business with them rather than Defendants. But that injury does not plausibly flow from that anticompetitive effect. It is not plausible that those consumers chose to do business with MEGA (or chose not to do business with Plaintiffs) because of the anticompetitive conduct on the part of MEGA and its alleged coconspirators. It would make no economic sense for a municipality to choose MEGA because MEGA was artificially inflating its prices. It may well be that a municipality might not have done business with MEGA had it known of the market allocation scheme, but that does not mean that the scheme caused it to enter into or piggyback onto MEGA contracts rather than REG contracts. Thus there is not even a causal connection between the anticompetitive conduct and the injury to

Plaintiffs (putting aside the lack of plausibility that those municipal clients would necessarily have chosen to do business with Plaintiffs had they not done business with MEGA). And the injury to Plaintiffs (lost commissions) did not flow from that which makes the alleged conduct illegal (market allocation through bid-rigging), but rather from the decisions of municipalities – for reasons of ignorance, cronyism or otherwise – to contract through MEGA despite the fact that it was allegedly disserving its municipal clients. *See Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 182 (S.D.N.Y. 2006) (federal antitrust laws do not recognize injury resulting from consumer's choice). The antitrust laws are not designed to prevent ignorance, cronyism or even bribery. Nor are they designed to prevent violations of public competitive bidding laws. *See id.* at 183. Thus, while injury to the municipal clients (higher prices) might well flow from the anticompetitive effect of the challenged practice (market allocation through bid-rigging), *see id.* at 181-82 (valid antitrust injury would be to public entity consumers, not to sellers looking to obtain bids from those entities), injury to Plaintiffs did not flow from that practice, *see Gatt*, 711 F.3d at 77 (bid-rigging by distributor harmed consumers by increasing prices, but no antitrust injury to plaintiff competitor who was prevented from distributing product, because its injury flowed from exclusion from distribution network, not bid-rigging).

Plaintiffs offer four alternative theories for how they have alleged an antitrust injury. (Ps' Mem. at 31-32.)[23] Plaintiffs' first theory is that they are competitors of MEGA and EnergyNext in the municipal energy consultant market. (*Id.* at 31.) As the Supreme Court has emphasized, "[t]he antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal

---

[23] "Ps' Mem." refers to Plaintiffs' Memorandum of Law in Opposition to MEGA, EnergyNext, M&R, and Constellation's Motions to Dismiss, (Doc. 236.)

quotation marks omitted).  The TAC, however, alleges no reduction in competition among consultants.  To the contrary, it alleges conduct on the part of MEGA that would disserve its clients and therefore assist competitors such as Plaintiffs.  And it shows a healthy level of competition among consultants.  The TAC alleges that municipalities questioned MEGA's practices and sought alternatives that would be more competitive.  (*Id.* ¶ 83.)  It describes several occasions between 2011 and 2016 when Plaintiffs were awarded consulting work by several municipalities, including the Town, Rockland County, Putnam County, and Poughkeepsie.  (*See, e.g.*, *id.* ¶¶ 86, 87, 97, 124, 181, 194.1, 194.2.)  It alleges that "Defendants feared all competition, but particularly from Plaintiffs – in less than 8 months' time, Rockland County, Putnam County and the City of Poughkeepsie withdrew their participation from MEGA and engaged the Plaintiffs."  (*Id.* ¶ 105.)  These facts suggest that there was competition in the marketplace for energy consulting and that Plaintiffs occasionally lost business to, and at other times beat out, competitors such as MEGA.[24]  "[I]njuries resulting from [such] competition alone are not sufficient to constitute antitrust injuries."  *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994); *see Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 418 (E.D.N.Y. 2013) ("[A] competitor's lost profits is not an injury 'of the type the antitrust laws were intended to prevent.'") (quoting *Gatt*, 711 F.3d at 77).

Plaintiffs assert that the anticompetitive practices alleged are bid rigging, market allocation, and predatory pricing.[25]  (Ps' Mem. at 29-32.)  Plaintiffs further assert that "[t]he

---

[24] Plaintiffs, MEGA, EnergyNext, and Duthie are not the only energy consultants serving municipalities.  (*See* TAC ¶¶ 48, 81, 106, 179.)

[25] Plaintiffs' allegation of predatory pricing is odd given that at certain points in the TAC they assert that Plaintiffs' ESCOs were the lowest bidders, (*see, e.g.*, TAC ¶¶ 270, 271, 276), which is inconsistent with the concept of "predatory pricing[, which] occurs when a firm sets prices below its marginal costs thereby taking losses in the short run.  The predatory firm hopes that similar losses will be experienced by its competitors prompting them to exit the industry.  The ultimate goal of the predatory firm is to recoup its losses by raising prices after competition is diminished."  *Volmar Distribs., Inc. v. N.Y. Post Co.*, 825 F. Supp. 1153, 1160 (S.D.N.Y. 1993).

anticompetitive effect of the Defendants' conduct was to channel public contracts from the true low bidders to the Defendants, leading directly to lost commissions for Plaintiffs, as well as to higher rates to the respective municipalities."  (*Id.* at 30.)  This argument only highlights that Plaintiffs lost profits and municipalities allegedly paid higher prices for energy.  Such allegations are insufficient to confer standing on Plaintiffs.  *See Yong Ki Hong*, 951 F. Supp. 2d at 418 (no antitrust injury where alleged price-fixing scheme would create artificially higher prices for customers because even "if such injuries were inflicted, they were not suffered by plaintiffs themselves; their injury was profit, not price"); *see also Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 109 (S.D.N.Y. 2015) ("Because Plaintiffs' alleged injury amounts to personal economic loss, Plaintiffs have failed to allege antitrust injury."); *Greene v. Conn. Bd. of Accountancy*, No. 00-CV-599, 2001 WL 286855, at *4 (D. Conn. Mar. 20, 2001) (no antitrust injury alleged where plaintiff's injury could "only be characterized as personal").  "The antitrust injury requirement cannot be met by broad allegations of harm to the market as an abstract entity.  Although all antitrust violations . . . distort the market, not every loss stemming from a violation counts as antitrust injury."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 n.8 (1990) (internal quotation marks omitted).  Accordingly, this first theory is insufficient to allege an antitrust injury.  *See Doron*, 423 F. Supp. 2d at 181 ("FAAC's entry into the market was pro-competitive; while FAAC's entry may have adversely impacted Doron as a competitor, it did not impact the competitive marketplace.  There is no antitrust injury in these circumstances.").

Plaintiffs' second theory – perhaps based on the recognition that "[g]enerally, only those that are participants in the defendants' market can be said to have suffered antitrust injury," *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 158 (collecting cases) – is that they compete

in the market for the supply of energy in that they are subcontractors of their ESCO supplier clients. (Ps' Mem. at 31.) The TAC alleges, in conclusory fashion, that "[i]t is near universal practice in the industry to treat a consultant or broker for energy as a subcontractor of the ESCO supplying the energy to the municipality." (TAC ¶ 35.) This allegation is apparently based on the fact that the municipality does not pay the consultant, but rather the consultant is paid a commission by the ESCO awarded the contract, with the amount based on the energy used by the municipality. (*Id.*)

There are several problems with Plaintiffs' second theory. First, that Plaintiffs get their cut from the winning ESCO in exchange for providing services to the municipality does not plausibly amount to subcontracting in any recognizable sense of the word.[26] Second, Plaintiffs' theory is that they compete in the same market as the ESCOs for whom they are subcontractors – in other words, that they are simultaneously competitor and subcontractor – which simply does not make sense. Third, Plaintiffs do not cite any authority supporting the notion that subcontractors to market participants are themselves participants in the market injured by an alleged scheme. Plaintiffs are not ESCOs and were not plausibly competing for contracts to supply energy. *See Martorano v. PP & L Energy Plus, L.L.C.*, 334 F. Supp. 2d 796, 801 (E.D. Pa. 2004) ("[Plaintiff's] consulting and brokerage activities do not compete with [Defendant's] wholesale of excess capacity credits . . . . Indeed, [plaintiff] is merely a peripheral rather than an integral player in the wholesale electricity market. Because [plaintiff] is neither a consumer nor competitor in the market in which trade was restrained, I find that it has not suffered injury of the type that the antitrust statute was intended to forestall.") (internal quotation marks omitted),

---

[26] A subcontractor is "[s]omeone who is awarded a portion of an existing contract by a contractor, esp[ecially] a general contractor." Black's Law Dictionary (10th ed. 2014).

*aff'd*, 137 F. App'x 491 (3d Cir. 2005); *see also Agfa Corp. v. Goldman Sachs Grp., Inc.*, No. 14-CV-211, 2016 WL 7009031, at *5 (S.D.N.Y. Nov. 30, 2016) ("[B]eing affected by the [alleged] anticompetitive conduct is simply not enough."), *appeal docketed*, No. 16-4243 (2d Cir. Dec. 22, 2016); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, No. 05-CV-4294, 2006 WL 2786882, at *8 (E.D.N.Y. Sept. 26, 2006) (no antitrust injury where "all of the specifically alleged antitrust activities by Defendants were in monopolizing the manufacturing market, not the distributorship market[, and] though Plaintiffs may have experienced an injury-in-fact that resulted from Defendants' activities, that injury was derivative of the direct injury inflicted upon the other manufacturers"), *aff'd*, 507 F.3d 117 (2d Cir. 2007). Accordingly, Plaintiffs second theory regarding antitrust injury is also deficient.

Plaintiffs' fourth theory is similar to the second in that Plaintiffs contend in the alternative that their injuries are "inextricably intertwined" with the injuries of the market participants. (Ps' Mem. at 31-32 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).)

> Usually the directly restrained market is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant. Sometimes, however, the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target.

*Nypl v. JPMorgan Chase & Co.*, No. 15-CV-9300, 2017 WL 1133446, at *4 (S.D.N.Y. Mar. 24, 2017) (citation and internal quotation marks omitted). "[T]o assess the plausibility of a . . . plaintiff's claim to antitrust injury as being inextricably intertwined with the injury the defendants ultimately sought to inflict, courts ask whether the plaintiff was manipulated or utilized by defendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 161 (alteration and internal quotation marks omitted); *see also Province v. Cleveland*

*Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986) ("An inextricably intertwined injury is one that results from the manipulation of the injured party as a means to carry out the restraint of trade in the product market."). Plaintiffs allege no facts fitting this theory. Plaintiffs' alleged injuries – not getting some consulting business – were not "the very means by which the [D]efendants [carried out the alleged conspiracy]. All of the alleged anticompetitive acts . . . were within the [D]efendants' power to do; they did not need or use injury to the [Plaintiffs] as a 'fulcrum' or 'conduit.'" *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 162; *see also Province*, 787 F.2d at 1052 ("[Plaintiffs'] injury was, at best, a result of – rather than a means to or cause of – the [defendant's] demise. Consequently, plaintiffs' alleged injury, along with the possible injuries of newsprint suppliers and others who would have benefitted from continued publication of the [defendant newspaper], was a tangential by-product of the alleged conspiracy to restrain trade in the newspaper market. As such, it does not aid plaintiffs' claim of standing.") (internal quotation marks omitted). Accordingly, the Court does not find that Plaintiffs' alleged injuries are "inextricably intertwined" with those of the ESCO market participants.

Plaintiffs' third theory is that "[D]efendants participated in a hub-and-spoke conspiracy, whereby MEGA and EnergyNext (the 'hub') at the consultant level of the market coordinated an agreement amongst horizontal competitors at the ESCO provider level (the 'spokes')." (Ps' Mem. at 31.) They do not elaborate on how such a theory assists them in demonstrating antitrust injury. As discussed above, the injury is still to the municipal consumers.

At bottom, Plaintiffs cannot show an antitrust injury under any of their theories because they do not, and cannot, allege that any municipality was required to select a particular ESCO or consultant, or accept a recommended bid, a fact that Plaintiffs tacitly concede. (*See, e.g.*, TAC ¶ 74 ("Tompkins County became reluctant to serve as MEGA's sponsor county, so MEGA began

to consider other counties that would be cooperative and allow themselves to be used for MEGA's inappropriate purposes."); *id.* ¶ 105 ("Defendants feared all competition, but particularly from Plaintiffs – in less than 8 months' time, Rockland County, Putnam County and the City of Poughkeepsie withdrew their participation from MEGA and engaged the Plaintiffs."); *see also id.* ¶ 40 ("[I]f energy consultants raise their fees, municipalities co[u]ld forgo their services and deal directly with the ESCO suppliers.").)  Because the municipalities could reject a successful bidder's contract in favor of other options and not select a particular consultant in the first place, MEGA's and EnergyNext's alleged agreement with the ESCOs could not inflict an antitrust injury on Plaintiffs.  Plaintiffs' response that the relevant municipalities "have little expertise in antitrust law or energy markets[, and] . . . are busy dealing with their municipal obligations, rather than policing antitrust violations," (Ps' Mem. at 34), is unpersuasive.  As noted earlier, municipalities apparently had no trouble choosing Plaintiffs as consultants over MEGA at various points throughout the relevant period.  (*See, e.g.*, TAC ¶¶ 86, 87, 97, 124, 179.)  Further,

> [i]t is not the role of this Court to judge the competence of public purchasing agents. Regardless, even if the procurement officers lacked intelligence or sophistication, the antitrust laws' applicability does not depend upon the sophistication of the consumer.  As long as the consumer had a choice free from anticompetitive forces, the antitrust laws do not apply.

*Doron*, 423 F. Supp. 2d at 173.

None of Plaintiffs' alternative theories or allegations are sufficient to plausibly allege antitrust injury.  Accordingly, Plaintiffs do not have standing to bring claims under the Sherman Act and Plaintiffs' antitrust claims are therefore dismissed.[27]

---

[27] Having decided that Plaintiffs have failed to state an antitrust injury, I need not address whether Plaintiffs meet the "efficient enforcer" requirement, although I tend to concur with Defendants, (*see, e.g.,* ESCOs' Mem. at 21-24; MEGA's Mem. at 14; EnergyNext's Mem. at 9-10), that they do not.  I also need not and do not reach the issues of

## C.    § 1983 Conspiracy

Plaintiffs allege a conspiracy to violate 42 U.S.C. § 1983 on the part of all Defendants. They allege that Defendants agreed to publicly discredit and defame Plaintiffs in retaliation for Plaintiffs having challenged the Town's improper conduct and in order to deprive REG of its right to be the Town's exclusive energy consultant.  (TAC ¶ 311.)  In their brief, Plaintiffs state that while they allege injury to their liberty and property interests under the Fourteenth Amendment's due process clause, "the crux of the unconstitutional injury element relates to the First Amendment."  (Ps' Mem. at 40; Doc. 237 at 14.)  By way of footnotes, they refer to the due process allegations in the TAC, but make no effort to develop any argument regarding them.  I therefore find those aspects of the claim have been abandoned, *see Forte v. Liquidnet Holdings, Inc.*, No. 14-CV-2185, 2015 WL 5820976, at *14 (S.D.N.Y. Sept. 30, 2015) (finding claim abandoned where only mention of it in plaintiff's brief was passing reference in footnote outlining legal standards), *aff'd*, 675 F. App'x 21 (2d Cir. 2017); *Rivera v. N.Y.C. Dep't of Corr.*, 951 F. Supp. 2d 391, 397 n.8 (E.D.N.Y. 2013) (claim abandoned where plaintiff provided no argument against summary judgment beyond making passing references in legal standard section of brief), and, like Plaintiffs, will focus on First Amendment retaliation.[28]

---

whether Plaintiffs' allegations make economic sense or otherwise state plausible antitrust claims.  (*See, e.g.,* ESCOs' Mem. at 21-24.)

[28] In any event, Plaintiffs do not plausibly allege a protected property right in their continued status as the Town's exclusive energy consultant following the expiration of the two-year initial period in October 2013, or any legal obligation on the Town's part in 2014 to piggyback on REG's contract with Rockland County.  *See Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014) (commercial contract with state actor does not give rise to entitlement protected as property interest under due process clause) (collecting cases); *Fletcher v. City of New Haven*, No. 11-CV-708, 2012 WL 1032967, at *2 (D. Conn. Mar. 27, 2012) (simple breach of contract by state actor does not amount to deprivation of property right) (collecting cases).  Nor do Plaintiffs allege a plausible "stigma-plus" claim for deprivation of a liberty interest.  Such a claim requires, among other things, that a statement impugning the plaintiff's reputation or integrity be made publicly, *see Segal v. City of N.Y.*, 459 F.3d 207, 212 (2d Cir. 2006), and while Plaintiffs allege in conclusory fashion that "[t]he former Ramapo Defendants made numerous public comments about Plaintiffs that . . . were stigmatizing and defamatory," (TAC ¶ 307), they do not in that connection refer to any such statements, and the Court was unable to locate them in the TAC.  (Klein's comment that "he had a proposal from Con Ed Solutions that contained hidden and undisclosed fees for Schiller" was allegedly made in closed session of the Town Board.  (*Id.* ¶ 235).)  Further, the TAC contains no facts from which it

The protected activity that Plaintiff alleges prompted the retaliation was:  1) private and public complaints to Town officials and the Town Board, on various dates between October 2012 and February 2014, about Duthie trying to horn in on Plaintiffs' role as energy consultant and about cronyism and fiscal irresponsibility on the part of Town officials, which Plaintiff said in February 2014 he had reported to the FBI, (TAC ¶¶ 206, 212, 217-18, 233-36, 242, 244); 2) making a contribution to Friedman in March 2013, (*id.* ¶ 223); 3) providing information to Friedman and the *Rockland County Times* in March 2014, (*id.* ¶ 249); and 4) filing a notice of claim in May 2014, (*id.* ¶ 253).  The alleged retaliation was the Town's "refusing to re-hire Plaintiffs, despite the fact that Plaintiffs' ESCO suppliers provided the lowest responsible 'bids,' and the defendants [*sic*] rigging of the 2014 Ramapo bid, so that Plaintiffs were deprived of sales commissions that rightfully belonged to them . . . ."  (Ps' Mem. at 44; *see* TAC ¶ 306.)

While Plaintiffs may have sufficiently alleged that the Town retaliated against Schiller – an issue I do not reach[29] – they have not plausibly alleged that the remaining Defendants conspired with the Town to do so.  To survive a motion to dismiss a § 1983 conspiracy claim, a plaintiff must plausibly allege:  "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of

---

could be plausibly inferred that any Defendant shared the Town's alleged desire to smear Plaintiffs publicly, and thus it does not allege the meeting of the minds necessary for a conspiracy claim.  Finally, "the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim," *Segal*, 459 F.3d at 214, and the TAC does not allege that Plaintiffs were deprived of process in the form of such a hearing, s*ee Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011) (availability of Article 78 proceeding provides requisite post-deprivation process for alleged stigma-plus deprivation of liberty, even if plaintiff fails to pursue it).

[29] One problem with Plaintiffs' theory is that the scheme to deprive REG of its contract and give it to Duthie seems to be alleged to have begun in the fall of 2012, before Schiller's complaints began.  Indeed, the complaints were about that alleged scheme.  On the other hand, Town officials are alleged to have directly discouraged Plaintiff from speaking publicly about the issue.  In January 2013, Finkelstein told Schiller that the Board would exclude him by going into executive session if he tried to speak publicly at a meeting, (TAC ¶ 212), and Klein told him that making complaints or filing grievances would only make matters worse, (*id.* ¶ 220).  In November 2013, Schiller was asked not to speak in a public portion of a Town Board meeting but was heard privately.  (*Id.* ¶¶ 233-34.)

that goal causing damages." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).

A "plaintiff must provide some factual basis supporting a meeting of the minds, such as that

defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Romer v.

Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (internal quotation marks omitted).

"[A] complaint containing only conclusory, vague, or general allegations of conspiracy to

deprive a person of constitutional rights cannot withstand a motion to dismiss." *Boddie v.

Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (internal quotation marks omitted). "'[D]iffuse and

expansive allegations are [likewise] insufficient, unless amplified by specific instances of

misconduct.'" *Ciambriello*, 292 F.3d at 325 (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100

(2d Cir. 1993)). In addition, a plaintiff must plead some "'details of time and place and the

alleged effect of the conspiracy,'" *Pollack v. Nash*, 58 F. Supp. 2d 294, 300 (S.D.N.Y. 1999)

(quoting *Dwares*, 985 F.2d at 100), although not necessarily the place, date and content of

meetings, *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005). "[S]ince conspiracy by

its very nature is a secretive operation, the elements of a conspiracy may be established through

circumstantial evidence." *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir. 1992) (internal

quotation marks omitted).

Plaintiffs confuse a possible agreement that Duthie would replace REG as the Town's

consultant, or that the Town would piggyback off of MEGA's contract rather than REG's, with

an agreement to retaliate for protected speech. Plaintiff may well have plausibly alleged that

MEGA and its ESCOs wanted to supply the Town's electricity and natural gas, and that Duthie

wanted to take over for REG as the Town's consultant, but there are no facts plausibly

suggesting that they wanted to do so because of Plaintiffs' exercise of their First Amendment

rights. "To establish a civil conspiracy under § 1983, Plaintiff has the burden of showing . . . that

two or more people entered into an agreement to violate the victim's civil rights . . . ." *Pizzuto v. Cty. of Nassau*, 239 F. Supp. 2d 301, 308 (E.D.N.Y. 2003). Here the TAC is devoid of facts suggesting that the Defendants cared about Schiller's exercise of his constitutional rights or agreed with the Former Town Defendants to retaliate for protected speech. "[T]he fact that these individuals may [have] be[en] interested in acquiring Plaintiff[s' business] does not, without more, establish that they [acted] in concert with government actors to . . . deprive [Plaintiff] of purported constitutional rights. Plaintiff[s'] concluding the same is a large leap in logic without the necessary evidentiary support." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 337 (E.D.N.Y. 2010) (citation omitted), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (summary order).

That Montal informed MEGA, EnergyNext, Constellation and M&R that one of the reasons the Town wanted to piggyback off of MEGA's Rockland County contract rather than REG's was to deprive Plaintiffs of fees, (TAC ¶ 315), does not suffice to plausibly suggest that the Defendants agreed with the Former Town Defendants on anything, let alone on retaliation for unmentioned speech. Plaintiffs provide some detail on communications between Defendants and the Town, but they appear to be business as usual and contain no hint of the Town's desire to retaliate against Schiller for speaking out. (*See, e.g.*, *id.* ¶¶ 258-60.) Likewise, that Schiller informed Cobuzzi and Spaeth that the Town was attempting to retaliate against him, (*id.* ¶¶ 262, 315), does not plausibly suggest that Cobuzzi and Spaeth knew the retaliation was for constitutionally protected activity, as opposed to any number of other things that might have caused the Town to become dissatisfied with Plaintiffs.[30] And even if the TAC plausibly suggested that the Defendants knew that the Town intended to retaliate for Schiller's speech

---

[30] Further, it would stretch the law beyond reason if, as Plaintiffs at least imply, a business must walk away from an opportunity merely because a competitor says that a customer for whom they are both competing has bad intent.

(which it does not), that would not suffice. *See Franzon v. Massena Mem'l Hosp.*, 89 F. Supp.

2d 270, 277 (N.D.N.Y. 2000) ("[M]ere knowledge of the existence of unconstitutional conduct

or association with the alleged conspirators alone is insufficient to establish membership in a

conspiracy."); *see also Robison v. Coey*, No. 15-CV-944, 2015 WL 6164113, at *3 (S.D. Ohio

Oct. 21, 2015) ("Liability under § 1983 cannot be based on mere knowledge of wrongdoing by

others . . . ."). Likewise, that Defendants were in contact with one another, (*see, e.g.*, TAC ¶ 68

("MEGA, EnergyNext, NYSAC and all other parties to the conspiracy worked in [the] same line

of business and frequently came into contact with each other. They regularly communicated

with each other via telephone, email and in person . . . [and] attended meetings together at the

behest of MEGA . . . .")), is not sufficient to plausibly allege an agreement, *see Cowan v. City of

Mount Vernon*, 95 F. Supp. 3d 624, 649 (S.D.N.Y. 2015) ("The fact of a meeting between some

Defendants is insufficient to establish a conspiracy. Plaintiff offers no factual basis that

Defendants entered into an agreement, express or tacit, to achieve an unlawful end.") (alteration

and internal quotation marks omitted). Nor is common motive – which Plaintiffs allege without

specifying what it was, (Ps' Mem. at 39-40) – sufficient to allege agreement, *see Mopurgo*, 697

F. Supp. 2d at 337.

  As Plaintiffs note, (Ps' Mem. at 38), "to present a plausible [conspiracy] claim at the

pleading stage, the[y] . . . need not show that [their] allegations suggesting an agreement are

more likely than not true or that they rule out the possibility of independent action, as would be

required at later litigation stages such as a defense motion for summary judgment." *Anderson

News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). Plaintiffs must, however,

"provide 'some factual context suggesting that the parties reached an agreement,' not facts that

would be 'merely consistent' with an agreement." *Id.* (alteration omitted) (quoting *Twombly*,

550 U.S. at 556).[31]  At most Plaintiffs have alleged that Defendants were aware that the Town wanted to stop doing business with Plaintiffs and took advantage of that fact.  Even if they were aware of the Town's allegedly unconstitutional motive (which is not plausibly alleged), independent actions on the part of Defendants that happen to further the alleged unconstitutional goals of the Town but grow out of Defendants' own commercial interests do not suffice to plausibly allege conspiracy.  "Even detailed allegations of parallel conduct do not suffice [to plead a § 1983 conspiracy] without some factual basis for inferring the existence of an agreement."  *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 102 (N.D.N.Y. 2013); *cf. Iqbal*, 556 U.S. at 680 (parallel conduct may be consistent with unlawful agreement but does "not plausibly suggest an illicit accord" where compatible with and more likely explained by lawful free-market behavior); *Twombly*, 550 U.S. at 557 (sufficient conspiracy pleading must contain allegations plausibly suggesting (not merely consistent with) agreement, and parallel conduct does not suffice:  "without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief") (internal quotation marks omitted); *id.* ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.").

The TAC includes many conclusory statements such as "Defendants entered into an express or implied agreement to public[ly] discredit and defame Plaintiffs in retaliation for

---

[31] In their opposition Plaintiffs mention that they have not yet been provided any discovery.  (*See, e.g.*, Ps' Mem. at 40 ("Because Plaintiffs have not been provided any discovery, Plaintiffs do not have knowledge of all of the communications between and amongst the defendants.").  This fact does not help Plaintiffs at this stage because under *Iqbal*, "a plausible claim must come *before* discovery, not the other way around."  *Angiulo v. Cty. of Westchester*, No. 11-CV-7832, 2012 WL 5278523, at *3 n.4 (S.D.N.Y. Oct. 25, 2012) (emphasis in original).

Plaintiffs' activities in challenging the Defendants' and the Town's improper, illegal, unauthorized and unethical conduct, and in order to deprive REG of its rights, benefits, status, and position as exclusive energy consultant for [the Town]." (TAC ¶ 311.) Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[T]he mere fact that Defendants are involved in the events of which [P]laintiff complains does not establish a conspiracy. Plaintiff[s] ha[ve] not asserted any facts to support that there was any agreement or meeting of the minds among the alleged conspirators to violate [Schiller's] constitutional rights." *Rosendale v. Brusie*, No. 07-CV-8149, 2009 WL 778418, at *22 (S.D.N.Y. Mar. 25, 2009) (alteration and internal quotation marks omitted), *aff'd*, 374 F. App'x 195 (2d Cir. 2010) (summary order). Accordingly, Plaintiffs' § 1983 conspiracy claim is dismissed.

**D.      State Law Claims**

"The traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that all of the claims over which this Court has original jurisdiction should be dismissed, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law causes of action for tortious interference with prospective business relations (Count Three), violation of New York's Deceptive Practices Act (Count Four), and violation of the Donnelly Act (Count Nine). *See id.* (citing 28 U.S.C. § 1367(c)(3)). Accordingly, Plaintiffs' state law claims are dismissed without prejudice.

**IV.   Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint three times, (*see* Docs. 22, 51, 154), after having the benefit of several pre-motion letters from Defendants outlining their proposed grounds for dismissal, (*see, e.g.*, Docs. 12, 16, 18, 29, 30, 102, 109, 110, 113, 114, 164, 165, 171), and the discussions at the November 4, 2015, March 29, 2016, and September 23, 2016, pre-motion conferences.  Plaintiffs' failure to fix deficiencies in previous pleadings, after being provided ample notice of them, is alone sufficient ground to deny leave to amend *sua sponte*. *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Payne v. Malernathew,*

No. 09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.").

Further, Plaintiffs have not asked to amend again or otherwise suggested they are in possession of facts that would cure the deficiencies identified in this opinion. Accordingly, the Court declines to grant leave to amend *sua sponte*. *See TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

## V.     Conclusion

For the reasons stated above, the motions to dismiss of Defendants Duthie, (Doc. 201), MEGA, (Doc. 216), Cobuzzi and M&R, (Doc. 217), Hills, Spaeth, and Constellation, (Doc. 221), Boyd and EnergyNext, (Doc. 228), and O'Gara, Wemple, and ConEd, (Doc. 231), are GRANTED.  Counts One, Five, Six, Seven and Eight are dismissed with prejudice, and Counts Three, Four and Nine are dismissed without prejudice.  The Clerk of Court is directed to amend the caption as set forth in footnote one, terminate the pending motions, (Docs. 201, 216, 217, 221, 228, 231), and close the case.

**SO ORDERED.**

Dated: August 28, 2017

White Plains, New York

_____

CATHY SEIBEL, U.S.D.J.